**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CHADLEY CAPITAL, LLC** | ) | **CASE NO. 24-10170** |
| | ) | |
| **DEBTOR.** | ) | **CHAPTER 7** |
| _____ | ) | |

## MOTION TO APPROVE COMPROMISE AND SETTLEMENT

NOW COMES Brian R. Anderson, Trustee for the above-captioned Debtor, by and through counsel, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and moves the Court for an order approving a compromise and settlement between the Trustee, Brandi Rhew, and William Rhew, III and, in support of said Motion, respectfully shows unto the Court the following:

1.     On March 12, 2024 (the "Petition Date"), an involuntary Chapter 7 petition was filed against Chadley Capital, LLC (the "Debtor"). On March 28, 2024, Brian R. Anderson was appointed as Chapter 7 Trustee. On April 5, 2024, an order for relief was entered against the Debtor.

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     William Rhew, III is the Debtor's sole owner and managing member.

4.     The Debtor was created in September 2017. From September 2017 through the Petition Date, Mr. Rhew, by and through the Debtor, perpetrated in an investment fraud and Ponzi Scheme. According to the United States Securities and Exchange Commission, the Debtor raised approximately $28 million from approximately 130 investors.[1] Over $37 million in claims have

---

[1] On September 23, 2024, the United States Securities and Exchange Commission instituted a Complaint against Mr. Rhew in the United States District Court for the Middle District of North Carolina, Case No. 1:24-cv-00771. A true

163203560.3

been filed in this case.

5.      In connection with this scheme, investors were led to believe that their investments were being used by the Debtor to operate in the receivable financing industry as a factoring company.  Mr. Rhew prepared various investor presentations and made other representations touting the Debtor's niche operation within the global factoring industry.  In those materials, and other representations to investors, Mr. Rhew represented that the Debtor would purchase the receivables of businesses and lend businesses money for a fee, touting a revenue increase from $100 million in 2019 to $300 million in 2023 and consistent returns to investors in excess of 20% per year.  The Debtor provided periodic account statements to investors that generally reflected profits and increased asset value.

6.      Mr. Rhew represented to investors that the Debtor offered guaranteed annual returns ranging from 18% to 48%, or more. Mr. Rhew solicited investments in the form of notes, often described as "Subordinated Debt Offerings" issued by the Debtor to investors.  Subordinated Notes issued by the Debtor provided that the Debtor would use the proceeds "to facilitate asset acquisition and comprehensive participation in the general fund of Chadley Capital, LLC."  The subordinated notes promised exorbitant interest rates, such as 4% per month, or 48% annually. The notes generally had maturities of one year.  Upon a note's maturity, the Debtor would often offer to roll the investor's combined principal and interest into a new note.  Mr. Rhew would offer and pay "finders fees" or referral bonuses to existing investors who brought in new investors. In most instances, notes were subordinated to all "senior debt," an overly broad term that subordinated the note to virtually all other obligations of the Debtor.  In at least one instance, the Debtor issued a subordinated note junior to a $27,400,000 debt to Capital One. This seemingly

---

and accurate copy of the Complaint is attached hereto as Exhibit A.

163203560.3

had the effect of preventing investors from ever being able to recover their investments.

7.     These statements and representations were false.  There was no "senior debt" to Capital One, or otherwise.  The Debtor did not have a material operation in the global factoring industry.  It did not have a business buying credit receivables or lending funds to companies.  It did not have any revenue or any legitimate source of income other than investor funds solicited under false pretenses.

8.     Instead, the Debtor used investor funds to make payments to earlier investors, to finance Mr. Rhew's personal lifestyle, and transferred funds to separate business entities he solely owned.  Any "returns" paid to investors came from other investors' funds.

9.     Since 2017, the Debtor, under Mr. Rhew's direction and control, used investors' funds for Mr. Rhew's personal benefit and the benefit of Brandi Rhew, his spouse ("Mrs. Rhew").  Transfers were made directly from the Debtor to third parties and indirectly through an entity solely owned by Mr. Rhew called Grace McLain Capital Advisors, LLC ("Grace McLain").  These transfers were used to, among other things, purchase an expensive waterfront home, purchase flights on private jets, purchase or lease automobiles, purchase a pleasure boat, and for other personal expenses.

10.     Relevant to this motion, investor funds were used to pay for and maintain certain real estate situated in Guilford County, North Carolina with a property address of 6081 Mountain Brook Road, Greensboro, North Carolina 27455 (the "Residence").  The Residence is owned by Mr. and Mrs. Rhew as tenants by the entireties.

11.     Solely with respect to the Residence, since September 2017, the Trustee has located approximately $257,813.94 in funds diverted from the Debtor used to pay for and maintain the Residence in the form of mortgage payments and escrowed amounts for ad valorem taxes and

insurance (the "Transferred Funds").   Mr. and Mrs. Rhew have benefitted from the Transferred Funds.  The Trustee contends that the Transferred Funds were made by the Debtor with the intent to hinder, delay, or defraud the Debtor's creditors, that the Transferred Funds are subject to avoidance under 11 U.S.C. § 548 and N.C. Gen. Stat. §§ 39-23.4 and 39-23.5, and that Mr. Rhew and Mrs. Rhew are liable for such transfers under 11 U.S.C. § 550.

12.    The Residence is encumbered by a first-priority consensual lien.  The Trustee believes that there is significant equity over and above the consensual lien, as much as $500,000.00.  However, the Residence is encumbered by certain liens and judgments that were fraudulently obtained by virtue of a forgery of Mrs. Rhew's signature, including a deed in trust in favor of WEW Checkbook, LLC and a Consent Judgment in favor of EREP Forest Hill I, LLC (the "Disputed Liens").

13.    The Trustee has interviewed Mrs. Rhew.  Mrs. Rhew has provided the Trustee with a sworn personal financial statement detailing her current assets and liabilities and an affidavit signed under the penalty of perjury concerning her personal knowledge of the Debtor's and Mr. Rhew's business activities and other matters that pertain to the Trustee's pursuit of claims and administration of the Debtor's estate.  Mrs. Rhew's affidavit is attached as an exhibit to the Settlement Agreement.  The Trustee is not aware of any evidence that Mrs. Rhew was aware of the Ponzi Scheme at the time it occurred.

14.    The Trustee and Mrs. Rhew have engaged in substantial discussions and negotiations concerning the Debtor, the Transferred Funds, and related issues.  The Trustee and Mrs. Rhew have agreed to settle their disputes, subject to Bankruptcy Court approval, pursuant to the terms and conditions set forth in the Settlement Agreement (the "Agreement"), attached hereto as Exhibit B.  Mr. Rhew, as evidenced by his signature to the Agreement, consents to and agrees

to his obligations under the Agreement but, notably, will not receive any sort of release as part of this agreement.

## **THE PROPOSED SETTLEMENT TERMS**

15.    A summary of the terms of the settlement, subject to Bankruptcy Court approval, are as follows:[2]

(a)    Transfer and Sale of the Residence:

i)    Mr. Rhew and Mrs. Rhew shall transfer all of their right, title, and interest in the Residence to the bankruptcy estate of Chadley Capital, LLC by quitclaim deed, to be held in trust by the Trustee pending Bankruptcy Court approval of the Agreement;

ii)    Any and all rights, title, or interests of Mr. or Mrs. Rhew with respect to the Residence shall transfer to the bankruptcy estate of Chadley Capital, LLC including, but not limited to, any causes of action relating to the Residence or its encumbrances, including the Disputed Liens;

iii)    The Trustee shall hire a broker and sell the Residence, subject to Bankruptcy Court approval;

iv)    The Trustee shall pursue the avoidance of the Disputed Liens or any other liens encumbering the Residence, with any costs associated with pursuing such causes of action to be borne by the bankruptcy estate.

v)    In the event the Trustee is successful in avoiding the Disputed Liens, the proceeds of sale shall be paid and distributed in the following order:

(1)    First, to broker commission, regular and customary closing costs, homeowner association dues, ad valorem taxes, and other costs associated with the sale of the Residence;

(2)    Second, to the satisfaction of the first priority deed of trust;

(3)    Third, to the bankruptcy estate in an amount equal to the Transferred Funds, $257,813.94; and

(4)    Fourth, any remaining sale proceeds shall be split equally between the bankruptcy estate and Mrs. Rhew.

---

[2] A description of the terms and conditions of the Agreement in this Motion are for illustrative purposes only. To the extent this summary conflicts with the specific terms and conditions of the Agreement, the Agreement shall control.

163203560.3

vi) In the event the Trustee is unsuccessful in avoiding the Disputed Liens in full (or a negotiated settlement amount is reached with respect to such lien), such lien(s) shall be paid from the proceeds of sale in the order of priority prior to any distribution to the bankruptcy estate or Mrs. Rhew as indicated above.

(b)     Mr. and Mrs. Rhew shall fully cooperate in the Trustee's investigation and prosecution of claims against third parties;

(c)     Mr. and Mrs. Rhew agree to transfer their interest in a timeshare purchased through Exotic Travelers to the bankruptcy estate <u>and</u> to the extent that the Trustee discovers other assets owned by them and obtained with the Debtor's funds, they agree to transfer those assets to the bankruptcy estate.

(d)     Mrs. Rhew shall receive a release from the bankruptcy estate of any and all claims, with such release subject to nullification as described in the Agreement and summarized below.  <u>Mr. Rhew shall not receive any release as part of this settlement.</u>

(e)     In an Affidavit attached to the Agreement, Mrs. Rhew has affirmed under the penalty of perjury her knowledge or lack thereof concerning matters involving the Debtor, Grace McLain, and encumbrances on the Residence.  To the extent that it is discovered that any material statement contained in Mrs. Rhew's Affidavit is false, the release contained in the Agreement shall be null and void and the Trustee shall be free to pursue her for any and all claims possessed by the bankruptcy estate, in the Trustee's business judgment.

## LEGAL STANDARD AND ARGUMENT

16.     It is well established that "to minimize litigation and expedite the administration of a bankruptcy estate," compromises are favored in bankruptcy. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). A determination of whether to approve an application to

compromise is a matter within the sound discretion of the bankruptcy judge. *In re Final Analysis, Inc.*, 417 B.R. 332, 341 (Bankr. D. Md. 2009). "In deciding whether a settlement proposed by a bankruptcy trustee should be approved, the bankruptcy court should make an informed, independent judgment as to whether a settlement is fair and equitable and in the bests interests of the estate." *Safeco Ins. Co. of Am. v. Yaeger (In re Magna Corp.)*, No. 01-80763, 2003 WL 22078082, at *3 (Bankr. M.D.N.C. Aug. 29, 2003) (citing *Protective Comm. For Indep. Stockholders Of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968) and *In re Energy Coop, Inc.*, 886 F.2d 91 (7th Cir. 1989)). "It is the court's responsibility to 'canvass the issues and see whether the settlement "falls below the lowest point in the range of reasonableness."'" *Id.* (internal citations omitted). "Central to this determination is a comparison of the terms of the settlement with the probable outcome and cost if the litigation or matter in dispute is not settled." *Id.*

17.     Factors to be considered in determining whether the settlement is within the range of reasonableness include: (i) the probability of success in litigation, (ii) the likely difficulties of collection, (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it, and (iv) the paramount interest of the creditors. *See In re Energy Future Holdings Corp.*, 648 F. App'x 277, 281 (3d Cir. 2016); *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *In re AuditHead, LLC*, 625 B.R. 319, 323 (Bankr. D.S.C. 2021); *In re D & R Distribs.*, 2016 WL 4821257, at *2 (Bankr. N.D. W.Va. Sept. 12, 2016).

18.     This proposed settlement is in the best interest of the estate under the above factors, as follows:

(a)     The Trustee has concluded that Mrs. Rhew is potentially subject to liability for not just the Transferred Funds, but for many other transfers from the Debtor to third parties that were made for her benefit going back to 2017. It is clear to the Trustee that

163203560.3

Mrs. Rhew, irrelevant of any knowledge she may have had at the time, was the beneficiary of these transfers. The Trustee estimates that Mrs. Rhew's potential liability is measured in millions, not thousands, given the length of time of the Ponzi Scheme.  The Trustee does not anticipate significant difficulties in succeeding in such litigation, but notes that the time and expense of pursuing Mrs. Rhew for liability for the avoidance of all transfers made for her benefit to be time consuming and expensive, as discussed below.

(b)     Even if the Trustee was successful in securing a judgment against Mrs. Rhew, collection of such judgment would be difficult, if not impossible, outside of the Residence itself, which is currently subject to foreclosure proceedings.  In connection with the settlement, Mrs. Rhew has provided the Trustee with a signed and sworn personal financial statement detailing her current assets and liabilities.  Her primary asset is the Residence, which is owned tenants by the entireties and exempt from most creditors.  As a result, Trustee believes Mrs. Rhew is effectively judgment proof.  Trustee does not anticipate Mrs. Rhew's financial status improving before any judgments could be secured against her.  Therefore, settling this matter now provides greater benefit to creditors because any future judgments would likely result in less money transferring to the estate given the associated litigation costs and expenses, the pending foreclosure, and the fact that Mrs. Rhew's financial status will not significantly improve.

(c)     With respect to the complexity of the litigation, the Trustee anticipates a significant number of avoidance actions will be filed in connection with the Debtor's case, and many of them will involve transactions that benefitted Mrs. Rhew.  Naming Mrs. Rhew as a party to each action would needlessly increase the complexity and cost of litigation, with little corresponding benefit given Mrs. Rhew's present financial situation. To the

contrary, the proposed settlement increases the prospect that the estate would receive funds in the near term.

(d)     The Trustee strongly contends that the proposed settlement is in the best interest of creditors for the following reasons:

i) The proposed settlement not only paves the way for the return of Transferred Funds that were misappropriated from the Debtor to maintain the Residence such as mortgage payments, taxes, and insurance, but also allows the bankruptcy estate to receive an additional 50% of the net proceeds of sale.  The Trustee estimates that the Residence has a fair market value in excess of $1,000,000.00, with potential equity beyond the first-priority mortgage of approximately $500,000.00, excluding the Disputed Liens.

ii) The transfer of the Residence to the bankruptcy estate brings property into the estate that can be sold for the benefit of creditors free and clear of liens, including the Disputed Liens, prior to an adjudication of those Disputed Liens.

iii) Time is of the essence in the approval and implementation of this settlement.  The Residence constitutes Mr. and Mrs. Rhew's primary asset. The Residence is currently subject to a pending foreclosure action filed in Guilford County Superior Court, Case No. 24SP001768-400 by the first-priority lienholder.  A hearing is scheduled for November 21, 2024 in that matter, as shown by the attached Order to Continue entered on August 14, 2024. A true and accurate copy of the Order to Continue is attached hereto as Exhibit C.  If the Residence is foreclosed upon, any equity in the Residence will likely be lost.

iv) This settlement preserves a valuable asset for the benefit of creditors whose funds were misappropriated to maintain that asset.

v) Furthermore, Mr. and Mrs. Rhew have agreed to transfer a timeshare to the bankruptcy estate and their commitment to cooperate with the Trustee will benefit the estate.

19.     In summary, the settlement results in the estate receiving a significant asset that will benefit the estate's creditors, of which there are many. The proposed settlement is in the best interest of the estate.

20.     Trustee recommends that the Court approve this settlement and compromise, after

notice and the opportunity for hearing, as provided in Rule 9019 of the Federal Rules of Bankruptcy Procedure.

WHEREFORE, the Trustee respectfully requests that the Court, enter an Order after notice and opportunity for hearing:

1.      Approving this settlement and compromise in accordance with the terms of the Agreement; and

2.      Granting such other and further relief as the Court deems just and proper.

This the 3rd day of October, 2024.

> */s/Brian R. Anderson*
> Brian R. Anderson
> N.C. State Bar No. 37989
> Fox Rothschild LLP
> 230 N. Elm St., Suite 1200
> Greensboro, NC 27401
> Telephone: (336) 378-5205
> branderson@foxrothschild.com
> *Attorney for Trustee*

10

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.** |
| **WILLIAM RHEW III,** | |
| **Defendant,** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This matter involves an investment fraud and Ponzi scheme perpetrated by defendant William Rhew, III ("Rhew" or "Defendant"), a resident of Greensboro, North Carolina, who raised approximately $28 million from approximately 130 investors.  The funds were raised through Chadley Capital, LLC ("Chadley Capital"), an entity controlled by Rhew.

2.      Beginning in at least November 2017 and continuing through at least

December 2023, Defendant solicited investments in the form of notes, described as "Subordinated Debt Offerings," issued by Chadley Capital.  Defendant represented to investors that Chadley Capital offered guaranteed annual returns of 18% to 48% through purported private investments in manufacturing debts.  In fact, Chadley Capital did not hold any interests in manufacturing debts as represented by Defendant.

3.    Defendant made misrepresentations in selling the investments. Defendant misrepresented the intended use of investors' funds.  Defendant operated the investment program as a Ponzi scheme, and misappropriated funds for Defendant's lavish lifestyle, and to fund the operating expenses of an unrelated retail business that he owned and controlled.  Among other things, Defendant used investor funds to purchase personal items, including flights on a private jet, a waterfront home, a Mercedes automobile and the purchase of a pleasure boat. Defendant provided periodic account statements to investors.  The statements generally reflected profits and increased asset values.  Those statements were fictitious.

4.    The foregoing conduct constitutes violations by Defendant of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.

2

§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## <u>DEFENDANT AND RELATED PARTIES</u>

**A.  Defendant**

5.      **<u>William Rhew III</u>**, is a resident of Greensboro, North Carolina.
Rhew is the sole member/owner of Chadley Capital and is the president/owner of
Chadley Management.

**B.  Related Parties**

6.      **<u>Chadley Capital LLC</u>**, is incorporated in Delaware and has its
principal place of business in Dover, Delaware.  On March 25, 2024, Rhew
consented to an involuntary Chapter 7 bankruptcy petition against Chadley Capital
filed by several of its investors.   Chadley Capital is not registered with the
Commission in any capacity.

7.      **<u>Chadley Management, Inc. d/b/a Spartan Safe</u>** ("Chadley
Management") is a North Carolina corporation with its principal place of business
in Kernersville, North Carolina.  From 2018 to 2022, Chadley Management
operated retail stores in several states that specialized in selling gun safes.  Chadley
Management ceased operations in November 2022 and filed a voluntary Chapter 7
bankruptcy petition on December 8, 2022.  Chadley Management has never been
registered with the Commission.

3

## JURISDICTION AND VENUE

8.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

9.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

10.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendant, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or the means and instrumentalities of interstate commerce, or the mails, including cell phones and the use of interstate banks.

11.     Venue is proper in this district as Defendant resides within this district.  Further, many of the acts complained of herein occurred within this district.

## THE FRAUDULENT SCHEME

12.     From at least November 2017 to at least December 2023, Defendant operated a Ponzi scheme involving the offer and sale of securities in the form of promissory notes ("the Notes") issued by Chadley Capital, based on Defendant's

representation that the funds would be used to purchase manufacturing debt, described as "accounts receivable factoring," and would provide returns of 18 to 48% per year.

13.     The Notes were denoted "Subordinated Note" and generally had maturities of one year, although some had maturities of 6 to 9 months.  Upon a note's maturity date, Rhew offered to roll the investor's combined principal and interest into a new note.  Because Rhew had been able to pay investors their promised returns until late 2022, most investors agreed to reinvest their earnings.

14.     Section 2 of the Notes provided that the company would use the proceeds "to facilitate asset acquisitions and comprehensive participation in the general funds of Chadley Capital LLC."

15.     Defendant also offered, and paid, a 2.5% referral bonus to existing Chadley Capital investors who brought in new investors.

16.     Beginning in late 2022, Defendant used offering materials entitled the Chadley Capital LLC Investor Presentation ("Investor Presentation") in offering and selling the Notes.  The Investor Presentation represented that, "With a core focus on the $3 trillion global factoring industry, Chadley Capital has carved out a niche operation within the space, primarily driven through the acquisition of (not lending against) its clients' invoices."

5

17.     The Investor Presentation further represented that Chadley Capital buys the receivables (credit invoices) of small and medium sized businesses and lends the businesses money for a fee.

18.     These representations were false.  Chadley Capital did not have a material operation in the global factoring industry, niche or otherwise, and did not have a business buying credit receivables and lending funds to companies.

19.     The Investor Presentation further claimed that Chadley Capital had increased its factoring revenue from $100 million in 2019 to $300 million in 2023, and that its rapid growth had provided investors with consistent returns in excess of 20% per year.  These representations were false.  Chadley Capital did not have the claimed revenue.  The "consistent returns" were paid to investors by misappropriating other investors' funds.

20.     The Investor Presentation stated under "Use of Proceeds" that the investor funds would be "to provide working capital for the purchase of discounted credit receivables…."  Defendant made similar claims orally.

21.     In fact, throughout the scheme, Defendant did not use the investor proceeds as represented.  Instead, Defendant used funds from investors to make payments to earlier investors, to finance his personal lifestyle, or to operate another business owned by him.

6

22.     Among other things, Defendant used investor proceeds to buy an expensive waterfront home, to buy flights on private jets, to buy automobiles, including at least one Mercedes, and to buy a pleasure boat.

23.     Defendant raised approximately $28 million from approximately 130 investors through the scheme, including at least $21.8 million after January 2019. Of the amount raised after January 2019, Defendant used $11.1 million to pay returns to earlier investors; transferred $4.6 million directly to fund the operating expenses of Chadley Management; and made various other payments to support that retail business and pay personal expenses.

24.     As of the date of this Complaint, most of the funds appear to have been dissipated.  Defendant provided checks and initiated wires to investors purporting to be returns, but most if not all of those checks and wires have been returned for insufficient funds.

## **COUNT I**

### **Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

25.     Paragraphs 1 through 24 above are hereby realleged and are incorporated by reference.

26.     From at least November 2017 through at least December 2023, Defendant, in the offer and sale of the securities described herein, by the use of means

and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

27.    Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

28.    By reason of the foregoing, Defendant, directly and indirectly, violated and, unless enjoined, will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and (a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and (a)(3)]

29.    Paragraphs 1 through 24 are hereby realleged and are incorporated by reference.

30.    From at least November 2017 through at least December 2023, Defendant, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to

8

make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.      engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

31.    By reason of the foregoing, Defendant, directly and indirectly, violated and, unless enjoined, will continue to violate, Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

32.    Paragraphs 1 through 24 above are hereby realleged and incorporated by reference.

33.    From at least November 2017 through at least December 2023, Defendant, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.      employed devices, schemes, and artifices to defraud;

      b.      made untrue statements of material facts and omitted to state

9

material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and

      c.      engaged in acts, practices, and courses of business which

would and did operate as a fraud and deceit upon the purchasers of such

securities,

all as more particularly described above.

      34.     Defendant knowingly, intentionally, and/or recklessly engaged in the

aforementioned devices, schemes and artifices to defraud, made untrue statements of

material facts and omitted to state material facts, and engaged in fraudulent acts,

practices and courses of business.

      35.     By reason of the foregoing, Defendant, directly and indirectly, violated

and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

## I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal

Rules of Civil Procedure, finding that Defendant committed the violations alleged.

**II.**

Permanent injunctions enjoining Defendant from violating, directly or indirectly, or aiding and abetting violations of, the laws and rules alleged to have been violated in this complaint, and from participating in the issuance, purchase, offer, or sale of any security (except purchase and sales from his personal account).

**III.**

An order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Defendant, from acting as officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**IV.**

An order requiring the disgorgement by Defendant of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**V.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendant.

11

## VI.

An order requiring Defendant to provide an Accounting.

## VII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted this 23rd day of September, 2024.

/s/ William P. Hicks
William P. Hicks
Senior Trial Counsel
Georgia Bar No. 351649
hicksw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE,
Suite 900
Atlanta, Georgia 30326-1232
Tel: (404) 842-7600

## EXHIBIT B

### SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") dated October 2, 2024, by and between Brandi Rhew ("Mrs. Rhew"), William L. Rhew III ("Mr. Rhew"), and Brian R. Anderson, Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of Chadley Capital, LLC ("Debtor"), Case No. 24-10170 pending in the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Case") (collectively, the "Parties").

### RECITALS

WHEREAS, on March 12, 2024 (the "Petition Date"), an involuntary Chapter 7 petition was filed against the Debtor, and on April 5, 2024, an order for relief was entered against the Debtor;

WHEREAS, the Trustee is the duly appointed Chapter 7 Trustee in the Debtor's Bankruptcy Case;

WHEREAS, Mr. Rhew is the managing member and sole owner of the Debtor;

WHEREAS, Mr. Rhew and Mrs. Rhew are the record owners of real estate situated in Guilford County, North Carolina with a property address of 6081 Mountain Brook Road, Greensboro, North Carolina 27455 as tenants by the entireties (the "Residence").

WHEREAS, the Trustee alleges, and has evidence to support, that prior to the Bankruptcy Case, the Debtor would solicit funds from investors falsely representing to them that their investments were being used to operate in the receivable financing industry as a factoring company;

WHEREAS, the Trustee alleges, and has evidence to support, that since its creation in September 2017, the Debtor had no legitimate source of income or revenue other than investor funds solicited under false pretenses;

WHEREAS, the Trustee alleges, and has evidence to support, that since September 2017, the Debtor, under Mr. Rhew's direction and control, used investors' funds for Mr. Rhew and Mrs. Rhew's personal benefit;

WHEREAS, the aforementioned transfers were made directly by the Debtor to third parties and indirectly through an entity solely-owned by Mr. Rhew called Grace McLain Capital Advisors, LLC ("Grace McLain");

WHEREAS, from September 2017 forward, Mr. Rhew and Mrs. Rhew used Grace McLain's bank account for personal expenses including, but not limited to, mortgage payments, taxes, and insurance on the Residence and a property in Southport, North Carolina, educational expenses for their children, personal credit cards, vehicle and watercraft loan and lease payments, charitable contributions, and personal tax obligations.

WHEREAS, solely with respect to the Residence, since September 2017, the Trustee has located approximately $257,813.94 in funds diverted from the Debtor used to pay for and maintain the Residence (the "Transferred Funds");

WHEREAS, the Trustee is not aware of any evidence that Mrs. Rhew was aware of the fraud perpetrated by the Debtor or Mr. Rhew at the time it occurred;

WHEREAS, the Trustee contends that the Transferred Funds were made by the Debtor with the intent to hinder, delay and defraud the Debtor's creditors;

WHEREAS, Mr. Rhew and Mrs. Rhew have benefited from Transferred Funds used to pay for and maintain the Residence;

WHEREAS, the Trustee contends that the Transferred Funds, among other transfers are subject to avoidance under 11 U.S.C. § 548 and N.C. Gen. Stat. §§ 39-23.4 and 39-23.5 and that Mr. Rhew and Mrs. Rhew are liable for such transfers under 11 U.S.C. § 550.

WHEREAS, the Residence is encumbered by certain liens and judgments that were fraudulently obtained by virtue of a forgery of Mrs. Rhew's signature, including a deed in trust in favor of WEW Checkbook, LLC and a Consent Judgment in favor of EREP Forest Hill I, LLC (the "Disputed Liens");

WHEREAS, the Trustee and Mrs. Rhew have engaged in substantial discussions concerning the Debtor, the Transferred Funds, and related issues and following negotiations between the Parties and in the interest of avoiding further expense and litigation, the Trustee and Mrs. Rhew desire to amicably resolve all their disputes, and have reached an agreement to settle their disputes, subject to Bankruptcy Court approval, pursuant to the terms and conditions set forth in this Agreement;

WHEREAS, in furtherance of settlement negotiations, Mrs. Rhew has provided the Trustee with a personal financial statement, detailing her current assets and liabilities and an affidavit signed under the penalty of perjury concerning her personal knowledge of the Debtor's and Mr. Rhew's business activities and other matters that pertain to the Trustee's pursuit of claims and administration of the Debtor's estate; and

WHEREAS, by his signature to this Agreement, Mr. Rhew consents to and agrees to his obligations under this Agreement and acknowledges the direct and indirect benefits of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

162579123.1

## SETTLEMENT TERMS

1. <u>Transfer and Sale of the Residence</u>.

   a. Upon execution of this Agreement, Mr. Rhew and Mrs. Rhew shall transfer all of their right, title, and interest in the Residence to the bankruptcy estate of Chadley Capital, LLC by quitclaim deed, which shall be held by the Trustee in trust pending approval of this Agreement. If the Agreement is not approved by the Bankruptcy Court, the Trustee shall destroy the deed or return the deed to Mr. and Mrs. Rhew.

   b. Further, Mr. Rhew and Mrs. Rhew agree and warrant that any and all rights, title or interests of any kind that they obtained with respect to the Residence, including, but not limited to, any right, title or interest in any causes of action relating to the Residence or with respect to any encumbrances on the Residence including the Disputed Liens shall transfer to the bankruptcy estate and become property of the bankruptcy estate.

   c. Upon transfer of the Residence to the estate, the Trustee shall hire a broker and sell the Residence, subject to Bankruptcy Court approval.

   d. The Trustee shall pursue the avoidance of the Disputed Liens or any other liens encumbering the Residence. Any costs associated with pursuing causes of action or challenging any encumbrance on the Residence shall be borne by the bankruptcy estate.

   e. In the event the Trustee is successful in avoiding the Disputed Liens, the proceeds of sale of the Residence shall be paid and distributed in the following order:

      i. First, to broker commission, regular and customary closing costs, homeowner association dues, ad valorem taxes, and other costs associated with the sale of the Residence;
      ii. Second, to the satisfaction of the first priority deed of trust in favor of Shellpoint mortgage;
      iii. Third, to the bankruptcy estate in an amount equal to the Transferred Funds, $257,813.94; and
      iv. Fourth, any remaining sale proceeds shall be split equally between the bankruptcy estate and Mrs. Rhew.

   f. In the event the Trustee is unsuccessful in avoiding the Disputed Liens in full (or a negotiated settlement amount is reached with respect to such lien), such liens shall be paid from the proceeds of sale in the order of priority prior to any distribution to the bankruptcy estate or Mrs. Rhew as indicated in Section 1(e)(iii) and (iv) above.

2. <u>Cooperation</u>.  Mr. Rhew and Mrs. Rhew agree to fully cooperate in the Trustee's investigation and prosecution of claims against third parties.

3. <u>Transfer of Timeshare and Other Assets</u>.  Mr. Rhew or Mrs. Rhew agree to transfer their

3

interest in a timeshare purchased through Exotic Travelers to the bankruptcy estate.  To the extent the Trustee discovers other assets owned by them and obtained with funds from the Debtor, Mr. Rhew and Mrs. Rhew agree to transfer those assets to the bankruptcy estate.

4.   <u>Release of Brandi Rhew</u>. Effective upon full performance of Mrs. Rhew's obligations under this Agreement, the Trustee shall release and discharge Mrs. Rhew of and from any and all claims, debts, liabilities, actions or causes of action of any kind or nature, existing, known or unknown, provided, however, that the Mrs. Rhew is not released from the obligations of this Agreement and that this release of Mrs. Rhew is subject to nullification under Section 5 of this Agreement.

5.   <u>Attestation of Personal Knowledge</u>. Attached hereto and incorporated herein by reference is the Affidavit of Brandi Rhew, in which Mrs. Rhew has affirmed under the penalty of perjury her knowledge or lack thereof concerning certain matters involving the Debtor, Grace McLain, and encumbrances on the Residence, among other matters.  In reaching this Agreement, the Trustee has relied on the veracity and truthfulness of the statements contained in the Affidavit.  To the extent that it is discovered that any material statement contained in Mrs. Rhew's Affidavit is false, the release contained in Section 4 shall be null and void and the Trustee shall be free to pursue her for any and all claims possessed by the bankruptcy estate, in the Trustee's business judgment.

6.   <u>Bankruptcy Court Approval</u>. This Agreement is subject to approval by the Bankruptcy Court.  In the event the Agreement is not approved, this Agreement shall be null and void and without force or effect.

7.   <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof, and this Agreement may not be amended except in writing signed by all of the Parties hereto.

8.   <u>Jointly Drafted</u>.  Each of the Parties hereto has had the opportunity to have counsel review this Agreement and this Agreement shall be deemed to have been jointly drafted by all Parties for the purposes of applying any rule of contract construction.

9.   <u>Benefit</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties, their respective heirs, legal representatives, successors and assigns.

10. <u>Authority</u>.   The undersigned acknowledge that each signatory Party hereto has full corporate power and authority to enter into this Agreement and to bind the Parties hereto and their successors and assigns.

11. <u>Voluntary Act</u>.   The Parties acknowledge, represent and agree, each with the other, that they have read this Agreement and the documents referenced herein in their entirety, have consulted their respective attorneys concerning the same, if desired, and have signed the same as their free and voluntary act.

12. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which counterparts collectively shall constitute one instrument.

162579123.1

Signatures may be exchanged by facsimile or electronic transmission, with original signatures to follow. Each Party to this Agreement agrees to be bound by its own facsimile and/or electronic signatures and agrees that it accepts the facsimile and/or electronic signatures of the other Parties hereto.

13. <u>Severability</u>. In case any one or more provisions of this Agreement shall be invalid, illegal and unenforceable in any respect, the validity, legality and enforceability of the remaining provisions in this Agreement will not in any way be affected or impaired thereby.

14. <u>Attorneys' Fees and Costs</u>. Each of the Parties shall bear its/his/her own attorneys' fees and costs.

15. <u>Governing Law; Jurisdiction of Court</u>. To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws. Each Party expressly consents to the continuing exercise of jurisdiction by the Court over any and all claims or disputes arising out of this Agreement. Each Party agrees that the Court has jurisdiction to enter a final order approving this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

By: _____
Brian R. Anderson, Chapter 7 Trustee for the bankruptcy estate of Chadley Capital, LLC and not individually

By: _____
Brandi Rhew

By: _____
William L. Rhew, III

5

162579123.1

deemed an original but all of which counterparts collectively shall constitute one instrument. Signatures may be exchanged by facsimile or electronic transmission, with original signatures to follow. Each Party to this Agreement agrees to be bound by its own facsimile and/or electronic signatures and agrees that it accepts the facsimile and/or electronic signatures of the other Parties hereto.

13. <u>Severability</u>. In case any one or more provisions of this Agreement shall be invalid, illegal and unenforceable in any respect, the validity, legality and enforceability of the remaining provisions in this Agreement will not in any way be affected or impaired thereby.

14. <u>Attorneys' Fees and Costs</u>. Each of the Parties shall bear its/his/her own attorneys' fees and costs.

15. <u>Governing Law; Jurisdiction of Court</u>. To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws. Each Party expressly consents to the continuing exercise of jurisdiction by the Court over any and all claims or disputes arising out of this Agreement. Each Party agrees that the Court has jurisdiction to enter a final order approving this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

By: _____
Brian R. Anderson, Chapter 7 Trustee for the bankruptcy estate of Chadley Capital, LLC and not individually

By: _____ 10/2/24
Brandi Rhew

By: _____
William L. Rhew, III

5

deemed an original but all of which counterparts collectively shall constitute one instrument. Signatures may be exchanged by facsimile or electronic transmission, with original signatures to follow. Each Party to this Agreement agrees to be bound by its own facsimile and/or electronic signatures and agrees that it accepts the facsimile and/or electronic signatures of the other Parties hereto.

13. <u>Severability</u>. In case any one or more provisions of this Agreement shall be invalid, illegal and unenforceable in any respect, the validity, legality and enforceability of the remaining provisions in this Agreement will not in any way be affected or impaired thereby.

14. <u>Attorneys' Fees and Costs</u>. Each of the Parties shall bear its/his/her own attorneys' fees and costs.

15. <u>Governing Law; Jurisdiction of Court</u>. To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws. Each Party expressly consents to the continuing exercise of jurisdiction by the Court over any and all claims or disputes arising out of this Agreement. Each Party agrees that the Court has jurisdiction to enter a final order approving this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

By: _____
Brian R. Anderson, Chapter 7 Trustee for the bankruptcy estate of Chadley Capital, LLC and not individually

By: _____
Brandi Rhew

By: _____
William L. Rhew, III

5

162579123.1

AFFIDAVIT OF BRANDI RHEW

BRANDI RHEW, being first duly sworn, deposes and says that:

1.      I am married to William "Bill" Rhew, III.  We were married in October 2014 and are currently separated.

2.      During our marriage Bill operated a number of businesses.  Chadley Capital, LLC and Chadley Management, Inc. are two of those business.  I am neither a member or shareholder of either entity.

3.      I was not involved in the day-to-day operations of either Chadley entity and had no knowledge of the day-to-day operations of either entity. I had no financial responsibilities for either Chadley entity.  Bill ran the day-to-day operations of both entities and was responsible for all operations pertaining to the Chadley entities.

4.      I had no access to any bank accounts of either Chadley entity.

5.      Bill is the owner of an entity by the name of Grace McClain Capital Advisors, LLC ("Grace McClain").  Bill directed that all of our personal expenses were to be paid out of the bank account for Grace McClain.  We used the Grace McClain bank account as our personal checking account for many years.  I believed that the Grace McClain money was our personal money to spend.

6.      Bill and I did not have any bank accounts in our personal names until the end of 2023.

7.      I relied on Bill and his direction in all financial aspects of our marriage.  I believed Bill to be a smart and honest businessman who was providing for our family.

8.      During our marriage Bill would ask our friends to invest money with him. September 2023 was the first time I learned that Bill was not paying our friends back their investments.

9.      In October 2023, I traveled with several of our friends' wives who had invested with Bill.  Many of Bill's investors were our friends and some life-long friends of mine.  When I returned from that trip, after learning more details, I left the marital residence.  Bill and I separated on October 9, 2023.

10.     Bill never asked me to pitch to investors nor did I ever pitch to investors.

11.     I never received any direct cash payments from investors or either Chadley entity.

12.    I was totally unaware of and had no knowledge of any fraud perpetrated by Bill.

13.    There is a deed of trust in favor of WEW Checkbook, LLC that encumbers our residence.  The same deed of trust encumbered our beach house, which has since been sold.  A copy of the deed of trust recorded in the Guilford County Registry is attached to my Affidavit.  I did not sign this deed of trust nor is the signature on the deed of trust my signature.  I never met with Barbara Fendley, the purported notary on the deed of trust that claims to have witnessed my signature.  I do not know William E. West and had never heard of him or WEW Checkbook, LLC until the Chadley Capital bankruptcy proceeding.  Bill has admitted to forging my signature on both deeds of trust.

14.    There was a lawsuit filed by EREP Forest Hill I, LLC in Guilford County Superior Court on May 5, 2023.  I was served through Bill by a private process server.  Bill did not provide me a copy of the civil summons or complaint.  A Consent Judgment was entered in the case on September 8, 2023.  The Consent Judgment was signed by Bill and included a signature purporting to be my signature.  I did not sign the Consent Judgment and the signature on the Consent Judgment is not my signature.  A copy of the Consent Judgment is attached to my Affidavit.

15.    I had no knowledge of the lawsuit and no knowledge of the Consent Judgment until after June 21, 2024.  On that date all the money in my personal checking account was levied.  I never spoke to or had any communication with the attorney representing EREP Forest Hill I, LLC.  Bill never told me about the lawsuit or anything in connection with the lawsuit.

16.    I accompanied Bill to an attorney's office on one occasion several years.  I believe I signed a will at the attorney's office.  I do not know if I signed any documents that established a trust.  I am unaware of an existing trust at this time.  I don't know if a trust was ever established by Bill.  To my knowledge, neither Bill, myself, nor our children are the beneficiary of any trust.

17.    I am unaware of any brokerage accounts held by or managed by Bill.

18.    I never saw large amounts of cash in our home during our marriage.

19.    We did not have a safe deposit box that I was aware of during our marriage.

20.    Bill purchased a timeshare in Mexico during our marriage.  We used the timeshare one time that I can recall.

21.    We purchased a beach house during our marriage.  The beach house has since been sold.  The proceeds of the sale were paid to the Chadley Capital, LLC bankruptcy estate.  I did not receive any proceeds from that sale.

22.    I am unaware of any money invested in Bill's parents' restaurant.

23.    I am unaware of any cryptocurrency purchases by Bill or the whereabouts of any cryptocurrency.

24.    I had absolutely no knowledge of any fraudulent activity.  I believed Bill ran a legitimate investment company in Chadley Capital.  I believed that all entities operated by bill were legitimate.

_____
Brandi Rhew

STATE OF _North Carolina_

COUNTY OF _Moore_

I, _Tabitha D Harper_, Notary Public of _Moore_ County, _North Carolina_, certify that Brandi Rhew personally appeared before me this day, and who being personally known to me and first duly sworn, deposed and said that she had read the foregoing Affidavit and knows the contents thereof; that the contents of same are true of her own knowledge except as to those matters and things stated therein upon information and belief, and as to those she believes them to be true.

Witness my hand and notarial seal this _2nd_ day of ~~September,~~ October 2024.

TABITHA D HARPER
NOTARY PUBLIC
Moore County, North Carolina
My Commission Expires 12/11/2027

_____

_Tabitha D. Harper_, Notary Public

My Commission Expires: _12/11/2027_

STATE OF NORTH CAROLINA    **FILED**   **EXHIBIT C**   IN THE GENERAL COURT OF JUSTICE
GUILFORD COUNTY     DATE: August 14, 2024    SUPERIOR COURT DIVISION
                   TIME: 3:24:34 PM      BEFORE THE CLERK
                   GUILFORD COUNTY
                   CLERK OF SUPERIOR COURT    24SP001768-
                   BY: S. Johnson          400

GODDARD & PETERSON
      vs.                  )
BRANDI & WILLIAM RHEW      )        **ORDER**
                            )    **TO CONTINUE**

     THIS MATTER is before the undersigned Assistant Clerk of Superior Court upon Notice of Hearing of foreclosure. This Court has jurisdiction of the subject matter of this proceeding, venue is proper, and all parties have been properly served with Notice of this hearing and of the matter.

     After review of the record, arguments of counsel and/or presentation of evidence, the Court hereby finds the following:

1. ☒  Substitute Trustee was present at the hearing.

2. ☒  Respondent(s) ☒ was    ☐ was not present at the hearing. ☐ Respondent was represented by

3. ☐   This matter is contested, and legal counsel was present to represent the lender:

4. ☒   The underlying mortgage loan ☐ is    ☒ is not subject to a foreclosure moratorium.

         **IT IS HEREBY ORDERED** that:
1. ☐   This action is dismissed without prejudice for


2. ☒   This matter is continued upon the motion of
   ☒Respondent    ☐ Trustee    ☐ Petitioner    ☐ Court's Own Motion
   Reason:
   RESPONDENT REQUEST CONTINUANCE FILING BANKRUPTCY


**The hearing will be held on the following date:**   11/21/2024 @ 2PM
                                       in Rm U19 of the
                                       Guilford County –
                                       Greensboro Courthouse

                         8/14/2024 3:24:40 PM

Date:    08/14/2024


Cc: Parties present in Court

                      *Shawn Johnson*
                      _____ Asst. CSC