# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

| | |
|---|---|
| IN RE: ) <br> ) <br> CONSOLIDATED ESTATE OF ) <br> CHADLEY CAPITAL, LLC AND ) <br> GRACE MCLAIN CAPITAL ) <br> ADVISORS, LLC, ) <br> ) <br> ) <br> DEBTOR. ) | CASE NO. 24-10170 <br><br> CHAPTER 7 |
| ) <br> BRIAN R. ANDERSON, CHAPTER 7 ) <br> TRUSTEE FOR THE CONSOLIDATED ) <br> ESTATE OF CHADLEY CAPITAL, ) <br> LLC AND GRACE MCLAIN CAPITAL ) <br> ADVISORS, LLC, ) <br> ) <br> PLAINTIFF, ) <br> ) <br> vs. ) <br> ) <br> HENDRICK AUTOMOTIVE GROUP, ) <br> LLC DBA HENDRICK TOYOTA OF ) <br> CONCORD, ) <br> ) <br> DEFENDANT. ) | ADV. PROC. NO. |

## COMPLAINT

NOW COMES Brian R. Anderson, Chapter 7 Trustee for the Consolidated Estate of Chadley Capital, LLC and Grace McLain Capital Advisors, LLC (collectively, the "Debtor"), by and through the undersigned counsel, complaining of Defendant, alleges and states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. On March 12, 2024 (the "Petition Date"), an involuntary Chapter 7 case was commenced against Chadley Capital, LLC. On March 28, 2024, Brian R. Anderson was appointed as Chapter 7 Trustee. On April 5, 2024, an Order for Relief was entered against Chadley Capital,

179689302.1

LLC.

2. On July 7, 2025, the Court substantively consolidated Chadley Capital, LLC and Grace McLain Capital Advisors, LLC, effective as of the Petition Date.

3. Plaintiff Brian R. Anderson ("Plaintiff") is the duly appointed, qualified, and acting Chapter 7 Trustee of the Debtor.

4. Hendrick Automotive Group, LLC dba Hendrick Toyota of Concord ("Defendant") is a North Carolina limited liability company with a principal place of business of 6000 Monroe Road, Charlotte, NC 28212-6119.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and it is a "core proceeding" pursuant to 28 U.S.C. § 157(b).

6. The Court has jurisdiction to enter a final Order in this matter. However, and to the extent the Court finds any claim for relief asserted herein to be a non-core proceeding, Plaintiff consents to the entry of a final Order in this matter in accordance with 28 U.S.C. § 157(c)(2).

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

8. The preceding allegations are realleged and fully incorporated herein.

## THE DEBTOR'S PONZI SCHEME

9. From at least November 2016 through the Petition Date, William L. Rhew, III ("Rhew"), by and through the Debtor, perpetrated an investment fraud and Ponzi scheme.[1]

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. *See Cunningham v. Brown*, 265 U.S. 1 (1924). "In such a scheme, money from new investors is used to pay artificially high returns to earlier investors to create an appearance of profitability and attract new investors so as to perpetuate the scheme." *Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (*citing Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)); *see also In re Unified Commercial Capital Inc.*, 260 B.R. 343, 345 n.1 (Bankr. W.D.N.Y. 2001) ("A 'Ponzi' scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly-attracted

179689302.1

10. From November 2016, if not earlier, the Debtor solicited at least $22 million from roughly 130 investors. Over $37 million in claims have been filed in the Debtor's bankruptcy case.

11. In connection with this scheme, investors were led to believe that their investments were being used by the Debtor to operate in the receivable financing industry as a factoring company. In furtherance of the Ponzi scheme, Rhew prepared and disseminated various investor presentations replete with false information and made other false representations about the Debtor touting the Debtor's niche operation within the global factoring industry. These false representations were intended to entice new investors, to solicit additional money from old investors, and to discourage old investors from withdrawing their principal.

12. The Debtor provided periodic account statements to investors that generally reflected profits and increased asset value and maintained an online database where investors could view their "investments."

13. The Debtor offered investors guaranteed annual returns ranging from 18% to 216%. The Debtor solicited investments in the form of notes, often described as "Subordinated Notes" issued by the Debtor to investors. The subordinated notes issued by the Debtor provided that the Debtor would use the proceeds "to facilitate asset acquisition and comprehensive participation in the general fund of Chadley Capital, LLC." The subordinated notes promised exorbitant interest rates. The notes generally had maturities of one year.

14. In many instances, upon a note's maturity, to prevent investors from withdrawing money and potentially collapsing the Ponzi scheme, the Debtor persuaded investors to roll their combined principal and interest into a new note promising even greater "returns." Many investors

---

investments.").

179689302.1

agreed to reinvest their earnings.

15.     The Debtor offered and paid "finders fees" or referral bonuses to existing investors who brought in new investors.

16.     In most instances, notes were subordinated to all "senior debt," an overly broad term that subordinated the note to virtually all other obligations of the Debtor.  In at least one instance, the Debtor issued a subordinated note purportedly junior to a $27,400,000 debt to Capital One.

17.     The statements and representations made by the Debtor and Rhew were false, and intentionally so. The Debtor was never anything other than a Ponzi scheme perpetuated by Rhew for his illegal financial gain.  Rhew has repeatedly admitted under oath that the Debtor was never a legitimate business and had no revenue or source of funds other than from the investors he defrauded.

18.     The Debtor never had any source of revenue or profits, it had no employees, and it had little to no operating expenses. The Debtor's bank records contain no evidence of the existence of a factoring company or any other business activities outside of the investment scheme.  The Trustee has located no evidence that the Debtor conducted any legitimate business since its inception.  The Debtor's bank records reveal no activity outside of taking investor money, repaying those same investors with other investor's funds, or using the funds for his own purposes. In other words, all activities of the Debtor were in furtherance of the Ponzi scheme

19.     In furtherance of the Ponzi scheme, Rhew used investors' funds to fund his extravagant lifestyle and for a variety of lavish purchases such as flights on private jets, luxury vehicles, a beach house, a Mexican timeshare condo, and a luxury boat, among other things.

20.     In late 2023, the Ponzi scheme collapsed when investors began asking for their

money back and the Debtor had nothing to pay them with. Investors began pursuing claims against the Debtor and Rhew and obtaining judgments against them.

21. In a last-ditch effort to keep the scheme going, the Debtor continued to solicit "investments" from prior investors and third parties. One such solicitation on November 26, 2023 stated:

> "I hope this email finds you well and coming off a wonderful Thanksgiving holiday. For a limited time, we are offering a 6-month Fixed Income Note with a guaranteed 2% monthly return on any investment over $100,000 (1.5% monthly on amounts less than).
>
> We are aiming to take advantage of some opportunity at year end on some low hanging fruit deals and would welcome any outside participation. We've offered this to a small circle over the week leading up to the holiday and have received several commitments, however, we are putting it out now to the masses. We'd love the chance to discuss it further with you or anyone you know that may have an interest in a quick round trip deal that obviously returns rather well."

22. On September 23, 2024, the United States Securities and Exchange Commission instituted a Complaint against Rhew in the United States District Court for the Middle District of North Carolina, Case No. 1:24-cv-00771 alleging violations of Section 17(a)(1), (a)(2), (a)(3) of the Securities Act (15 U.S.C. § 77q) and Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b) and Rule 10b-5 (17 C.F.R. § 240.10b-5] (the "SEC Enforcement Action"). *Securities and Exchange Commission v. Rhew*, Case No. 1:24-cv-000771-TDS-JLW, Doc. 1 (M.D.N.C. Sept. 23, 2024).

23. In connection with the SEC Enforcement Action, Rhew executed a notarized a "Consent of Defendant William Rhew III to Entry of Judgment," in which while he neither admitted or denied the SEC's allegations, he agreed that in further proceedings in the SEC Enforcement Action, he is precluded from arguing that he did not violate federal securities laws as alleged in the Complaint. *Securities and Exchange Commission v. Rhew*, Case No. 1:24-cv-

179689302.1

000771-TDS-JLW, Doc. 3 (M.D.N.C. Oct. 1, 2024).

24. On November 22, 2024, the District Court entered a Consent Judgment against Rhew in the SEC Enforcement Action permanently enjoining him from violating Section 10(b) of the Securities Exchange Act of 1934, Section 17(a) of the Securities Act of 1933, among other relief, and requiring Rhew to pay disgorgement of all ill-gotten gains, with the amount of such ill-gotten gains to be determined at a later date. *Securities and Exchange Commission v. Rhew*, Case No. 1:24-cv-00771, Doc. 4 (Nov. 22, 2024).

25. On April 22, 2025, Rhew pleaded guilty to five counts associated with the Ponzi scheme: wire fraud, money laundering, securities fraud, tax evasion, and willful failure to file a tax return. *United States of America v. Rhew*, 1:25-cr-00142-TDS-1 (M.D.N.C. 2025).

26. Given the existence of the Ponzi scheme, the Debtor has been insolvent since its inception.

## DEBTOR'S FRAUDULENT TRANSFER TO DEFENDANT

27. In furtherance of the Ponzi scheme, on January 24, 2022, the Debtor transferred a total of $19,890.24 to Defendant (the "Transfer"). A listing of the transfer from the Debtor to Defendant is attached hereto as Exhibit A.

## FIRST CLAIM FOR RELIEF
### Avoidance of Transfer
### 11 U.S.C. § 544(b), N.C. Gen. Stat. § 39-23.4(a)(1) and (a)(2)

28. The proceeding allegations are realleged and fully incorporated herein.

29. Under 11 U.S.C. § 544(b), the Trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim allowable under 11 U.S.C. § 502.

30. Under N.C. Gen. Stat. § 39-23.4(a)(1), a transfer made or obligation incurred by a

179689302.1

debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with the intent to hinder, delay, or defraud any creditor of the debtor.

31. Under N.C. Gen. Stat. § 39-23.4(a)(2), a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor (a) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

32. At the time of the Transfer and afterward, the Debtor was indebted to one or more creditors holding an unsecured claim that is allowable under 11 U.S.C. § 502. The Debtor's schedules and the claims register identify multiple creditors that can serve as the triggering creditor under Section 544(b). For example, William Gallagher held a claim of $122,050.00 as of November 1, 2016 and holds an unsecured claim in this case [Claim No. 40].

33. Under N.C. Gen. Stat. § 39-23.9(1), the Trustee may bring an action to avoid a transfer under § 39-23.4(a)(1) not later than four years after the transfer was made or the obligation incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant. The Transfer was made within four years of the Petition Date.

34. At all times relevant and relating to the Transfer, the Debtor was a "debtor" within the meaning of N.C. Gen. Stat. § 39-23.1(6).

35. The Transfer was a "transfer" within the meaning of N.C. Gen. Stat. § 39-23.1(12).

36. At the time of the Transfer, the Debtor was operating a Ponzi scheme and thus had the actual intent to delay, hinder and defraud creditors and made the Transfer to delay, hinder, and defraud creditors. The Transfer was inherently fraudulent and is avoidable by the Trustee.

37. The Transfer was made in furtherance of the Debtor's Ponzi scheme and for Rhew to use Debtor funds and assets to enrich himself and his family at the expense of the Debtor's creditors.

38. The following badges of fraud applicable to the Transfer include, but are not limited to: (a) the Debtor was insolvent when it made the Transfer to Defendant; (b) at the time of the Transfer, the Debtor was unable to pay its debts as they came due, (c) at the time of the Transfer, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; (d) the Debtor did not receive reasonably equivalent value in exchange for the Transfer; (e) the Debtor concealed one or more of the Transfer; (f) the Debtor concealed the fraudulent nature of the Transfer; (g) the Debtor made the Transfer at the same time it was divesting itself of other assets; (h) at the time of the Transfer, the Debtor and Rhew were engaged in multiple criminal acts intended to defraud creditors, and these acts included the looting of the Debtor's assets for Rhew's personal gain; (i) the Transfer provided no benefit to the Debtor; (j) the Transfer was not made pursuant to any legitimate business purpose of the Debtor; (k) the Transfer served no purpose other than to hinder, delay, and defraud creditors of the Debtor.

39. By its very nature as a Ponzi scheme, the Debtor was insolvent since its inception and at the time of the Transfer. At no point did the Debtor have any legitimate source of funds or revenue to pay for the Transfer other than investor money that would eventually run out. At all

179689302.1

times, including at the time of the Transfer, the Debtor was engaged an investment scheme for which its assets were unreasonably small in relation to its obligations to other investors.

40. As a result of the Transfer, the remaining assets of the Debtor's estate are insufficient to pay the estate's debts and liabilities, including the claims of other creditors in the Ponzi scheme.

41. The Debtor received less than reasonably equivalent value and in fact received no value in exchange for the Transfer.

42. The Debtor was not obligated to the Defendant.

43. At all times relevant and relating to the Transfer, the Debtor never had profits or revenues and never had the ability to generate sufficient revenues to sustain operations or repay investors and therefore was engaged in a business with unreasonably small assets or capital.

44. At all times relevant and relating to the Transfer, the Debtor had no assets other than investor funds and was actively incurring debts beyond its ability to repay them.

45. At all relevant times, including at the time of the Transfer, the Debtor had no reasonable belief that it had the ability to pay debts as they came due.

46. At the time of the Transfer, the Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured and in fact could not pay back the debts it incurred.

47. At all relevant times, including at the time of the Transfer, the Debtor had to know that the monies from investors would eventually run out, that the Transfer would contribute to the eventual collapse of the Ponzi scheme, and that future investors would not be paid.

48. The Debtor's estate has been diminished in the amount of the Transfer.

49. The Transfer made by the Debtor is avoidable pursuant to 11 U.S.C. § 544(b) and

179689302.1

N.C. Gen. Stat. § 39-23.4(a)(1) and (a)(2); and Plaintiff is entitled to avoid the Transfer for the benefit of the estate.

**SECOND CLAIM FOR RELIEF**
**Avoidance of Transfer**
**11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.5(a)**

50. The preceding allegations are realleged and fully incorporated herein.

51. Under 11 U.S.C. § 544(b), the Trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim allowable under 11 U.S.C. § 502.

52. Under N.C. Gen. Stat. § 39-23.5(a), a transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

53. At the time of the Transfer, the Debtor was indebted to one or more creditors holding an unsecured claim that is allowable under 11 U.S.C. § 502. The Debtor's schedules and the claims register identify multiple creditors that can serve as the triggering creditor under Section 544(b). For example, William Gallagher held a claim of $122,050.00 as of November 1, 2016 and holds an unsecured claim in this case [Claim No. 40].

54. Under N.C. Gen. Stat. § 39-23.9(2), the Trustee may bring an action to avoid a transfer under N.C. Gen. Stat. § 39-23.5(a) not later than four years after the transfer was made or the obligation incurred. The Transfer was made within four years of the Petition Date.

55. At all times relevant and relating to the Transfer, the Debtor was a "debtor" within the meaning of N.C. Gen. Stat. § 39-23.1(6).

56. The Transfer was a "transfer" within the meaning of N.C. Gen. Stat. § 39-23.1(12).

57. By its very nature as a Ponzi scheme, the Debtor was insolvent since its inception and at the time of the Transfer. At no point did the Debtor have any legitimate source of funds or revenue to pay for the Transfer other than investor money that would eventually run out. At all times, including at the time of the Transfer, the Debtor was engaged an investment scheme for which its assets were unreasonably small in relation to its obligations to other investors.

58. At all times relevant and relating to the Transfer, the Debtor never had profits or revenues and never had the ability to generate sufficient revenues to sustain operations or repay investors and therefore was engaged in a business with unreasonably small assets or capital.

59. At all times relevant and relating to the Transfer, the Debtor had no assets other than investor funds and was actively incurring debts beyond its ability to repay them.

60. At all relevant times, including at the time of the Transfer, the Debtor had no reasonable belief that it had the ability to pay debts as they came due.

61. At all relevant times, including at the time of the Transfer, the Debtor had to know that the monies from investors would eventually run out, that the Transfer would contribute to the eventual collapse of the Ponzi scheme, and that future investors would not be paid.

62. The Debtor received less than reasonably equivalent value in exchange for the Transfer.

63. The Debtor's estate has been diminished in the amount of the Transfer.

64. The remaining assets of the Debtor's estate are insufficient to pay the estate's debts and liabilities, including the claims of other creditors in the Ponzi scheme.

65. The Transfer is avoidable pursuant to 11 U.S.C. § 544(b), N.C. Gen. Stat. § 39-23.5(a), and Plaintiff is entitled to avoid the Transfer for the benefit of the estate.

179689302.1

## THIRD CLAIM FOR RELIEF
### Recovery of Avoided Transfer – 11 U.S.C. § 550(a)(1)

66. The preceding allegations are realleged and fully incorporated herein.

67. Pursuant to 11 U.S.C. § 550(a)(1), as the Transfer is avoidable under 11 U.S.C. § 544, Plaintiff is entitled to recover, for the benefit of the estate, the Transfer or the value of the Transfer from the Defendant as the Defendant is the initial transferee of the Transfer.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment/Restitution

68. The preceding allegations are realleged and fully incorporated herein.

69. Besides the preceding claims as to Defendant, Plaintiff sets forth the following claim for relief for restitution and unjust enrichment.

70. This claim is asserted as an alternative assuming the statutory remedies in the preceding claims do not provide an adequate remedy at law.

71. The Debtor fraudulently transferred $19,890.24 to Defendant in furtherance of a Ponzi scheme.

72. The funds Defendant received and accepted from Debtor conferred a benefit upon Defendant.

73. The Debtor received no value or benefit in exchange for the Transfer.

74. It is inherently unfair and inequitable that the funds of other creditors defrauded in the Ponzi scheme are retained and used to benefit Defendant rather than being returned to the Debtor's estate for the benefit of all defrauded creditors.

75. Defendant wrongfully secured or passively received a benefit that it would be unfair and unconscionable for Defendant to retain.

179689302.1

76. As a direct and proximate result of Defendant's retention of $19,890.24, the Debtor's estate has been diminished, and under the circumstances, equity dictates that Defendant return to the Trustee for the benefit of all creditors of the estate the amounts it received from Debtor's fraudulent scheme and any assets it may have acquired with such funds.

**WHEREFORE,** Plaintiff respectfully requests this Court grant the following relief:

1. Avoid the Transfer in its entirety pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. §§ 39-23.4(a)(1), (a)(2), 39-23.5(a);

2. Recover the Transfer or the value of the Transfer and enter judgment in favor of Plaintiff against the Defendant under 11 U.S.C. § 550(a) in the amount of $19,890.24;

3. Enter judgment in favor of Plaintiff against the Defendant for unjust enrichment in an amount of $19,890.24, equal to the amount of Transfer Defendant received;

4. Award pre-judgment and post-judgment interest at the maximum legal rate until paid in full, with such recovery being for the benefit of the Debtor's estate;

5. Tax the costs of this action to the Defendant; and

6. Grant such further relief as this Court deems just and proper.

Respectfully submitted this 4th day of December, 2025.

      *s/Brian R. Anderson*
Brian R. Anderson
N.C. State Bar No. 37989
branderson@foxrothschild.com
Ellis Martin
N.C. State Bar No. 49380
emartin@foxrothschild.com
Fox Rothschild LLP
230 N. Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: 336-378-5205
*Attorneys for Trustee*

179689302.1

# **EXHIBIT A**

## **TRANSFER**

179689302.1

